(C. D. 857)

OXFORD UNIVERSITY PRESS, N. Y., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 17, 1944)

*Lane & Wallace* (*William H. Fox* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Joseph E. Weil*, special attorney) for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges

KINCHELOE, Judge: This is a suit for the recovery of certain customs duty alleged to have been improperly assessed on an importation of unbound books described on the invoice as "O. B. English Verse." The books were assessed with duty at 20 per centum ad valorem under paragraph 1410 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom (T. D. 49753), effective January 1, 1939, as unbound books of other than bona fide foreign authorship. The claim is made by the plaintiff that the said books are either wholly, substantially wholly, or chiefly of bona fide foreign authorship, and are therefore dutiable at only 7½ per centum ad valorem under said paragraph 1410 and said trade agreement, as unbound books of bona fide foreign authorship.

The protest has been submitted for decision upon two written stipulations between counsel on both sides, which, so far as pertinent, read as follows:

It is stipulated and agreed between counsel, in the matter of the above protest, that the book submitted herewith and marked exhibit 1 is a true and correct sample of all the books imported in cases X24 to X30 inclusive, and described on the invoice as "O. B. English Verse," and that said book may be received in evidence herein as exhibit 1.

That the books represented by said exhibit 1 were imported unbound and were assessed with duty at 20 per centum under Par. 1410, Tariff Act of 1930, as modified by the trade agreement with the United Kingdom (T. D. 49753).

That Sir Arthur Quiller-Couch now is and always has been a subject of Great Britain.

That the said exhibit 1 was printed and published in Great Britain, contains 1141 pages of selections, and was bound in the United States.

That said 1141 pages of selections consist of poems, or parts thereof, written by approximately 300 foreign authors, and 10 American authors. The selections written by the American authors, included in said book, appear at the following pages: William Cullen Bryant pp. 761–763, Ralph Waldo Emerson pp. 799–805, Henry Wadsworth Longfellow pp. 817–822, John Greenleaf Whittier pp. 822–823, Edgar Allan Poe pp. 825–829, Walt Whitman pp. 898–900, Emily Dickinson p. 961, Bret Harte p. 990, William Dean Howells p. 991, and Bliss Carman pp. 1054–1057. All of the other selections included in said book were written by foreign authors, the names of whom appear in the "Contents" at pages XIX to XXVIII (except those on pp. 780–781 and 901, the authors thereof being anonymous).

It is further stipulated and agreed between counsel in the matter of the above protest, that Sir Arthur Quiller-Couch chose from the field of English verse the selections which appear in exhibit 1, edited them, modernized certain of the spelling, and in certain instances included "a few stanzas from a long poem when persuaded that they could stand alone as a lyric." He also arranged the material in the form that it appears in exhibit 1, wrote the Preface to the First Edition on pages VII to XI, the Preface to the New Edition on pages XII–XIII, the Acknowledgments on pages XV to XVIII, and prepared table of Contents on pages XIX to XXVIII, the Glosses of Archaic and otherwise difficult words at the foot of various pages, and the Index of Authors and First Lines on pages 1144 to 1172 inclusive.

We might further say that the book in question, as bound, is entitled "The Oxford Book of English Verse.   1250–1918."

The relevant facts in the case therefore are that "The Oxford Book of English Verse" here in question is an anthology containing altogether 1141 pages of poems, or excerpts thereof, written by approximately 300 foreign authors, and 10 American authors; that the selections written by the American authors comprise approximately 28 pages of the 1141 pages, and that all of the other selections in the book, including the prefaces, acknowledgments, and table of contents, index of authors, and index of first lines, were written by foreign authors.   In other words, it is shown that of the 1141 printed pages of the book 28 pages thereof, or 2.45 per centum, represent the part written by the American authors, while the remaining pages were written by foreign authors.   The question before us therefore is whether on this state of facts the book is one of foreign authorship under said paragraph 1410 and said trade agreement, as claimed by the plaintiff, or whether it was properly classified and assessed for duty as a book of other than bona fide foreign authorship under said paragraph and said trade agreement.

Counsel for plaintiff in their brief argue in effect that compilation is a form of authorship, and that as the compilation in the present instance was exclusively the work of an Englishman the book can properly be considered wholly of bona fide foreign authorship irrespective of the original authorship of the selections of verses contained therein.   We quote from their brief as follows:

In order to determine whether or not the books at bar are of bona fide foreign authorship it becomes necessary to decide how the authorship of those books is to be determined.   The book, as such, is the creation of one Sir Arthur Quiller-Couch, an English subject, who is solely responsible for the existence of the book in the form as published.

He did not personally write the poems which appear in the book.   They are the product of over 300 different writers both living and dead.   In the production of the book Quiller-Couch ranged over the vast field of English verse, and in his carefully considered discretion selected the various poems, or excerpts thereof, which he included in his book.   It was necessary for him to go through a great mass of subject matter, decide therefrom what poems to include in the book, then prepare, arrange, and edit the poems he selected, and also prepare and write everything else found in connection with the poems that goes to make up the book. All of that work was performed exclusively by Quiller-Couch, and the book at bar, in its form as a book, is in fact his production.

Plaintiff claims that since the books at bar would not exist in their form as books but for the work performed by Quiller-Couch, they are his creation.   That the character of the work performed by him in producing those books clearly is authorship, and that the authorship of those books is determined by the nationality of the creator of the book, and not by the nationality of the writers of the various poems included in the book by its creator.

We will take it for granted that the preparation and production of the book in question involved all the work on the part of the compiler,

Sir Quiller-Couch, as described above, and if the question for our determination were simply whether the compilation of the verses and the whole arrangement of the book by the compiler was susceptible of authorship under the said provision of paragraph 1410 of the tariff act, we would have no hesitancy in so holding. Note *United States v. American Railway Express Co. et al.*, 17 C. C. P. A. 10, T. D. 43317. The merchandise in that case consisted of certain printed books and pamphlets giving details as to fishing, hunting, camping, wood lore, resorts, and like subjects, some of which were profusely illustrated, while others were smaller and contained only lists of resorts, time tables, and similar information. They were claimed to be dutiable as of bona fide foreign authorship under paragraph 1310 of the Tariff Act of 1922, which corresponds to paragraph 1410 of the present act. In passing on that question the court first found it necessary to pass on the question whether the publications were of such a character as to be susceptible of authorship. On this point, we quote from the decision as follows:

Accepting the definition as thus given of an author, as "one who composes or writes a book, a composer as distinguished from an editor, translator, or compiler," it is evident to the court that the exhibits before us are susceptible of authorship. It would be a work of supererogation for us now to attempt to describe each exhibit individually, and to point out wherein authorship is manifest. It is sufficient to say that the exhibits are full of descriptive historical and geographical matter, and such matter as required mental effort and ability to prepare. It is said that some of these exhibits, notably illustrative exhibit 6, Hotels and Boarding Houses, is nothing but a compilation, and is not the work of an author. The testimony shows, as to this particular exhibit, that the person preparing it was obliged to investigate throughout the Canadian provinces, and to obtain, in any way he could, information as to the various hotels and boarding houses and camps, and was required to arrange the same so that the information might be accessible. In addition, many tabulated statements of other matters of information to the traveler are contained in this pamphlet, which includes 80 pages of closely printed informative material. We are aware of no definition of authorship which would exclude a work such as this. To do so would exclude many valuable scientific publications, works on mathematics, digests, travelers' guides, and similar works, which, although to a considerable degree compilations, are, nevertheless, works which require authorship.

Note also *United States v. Field & Co.*, 14 Ct. Cust. Appls. 376, T. D. 42031.

Under the foregoing authorities every part of the book in the present instance is of course susceptible of authorship. But as to the more specific claim for dutiable classification of the book under said paragraph 1410, as books of bona fide foreign authorship, as against books of other than foreign authorship, an additional factor arises which raises the question as to what extent a book must be of foreign authorship to be entitled to that classification.

Plaintiff in support of its claim that the book here under consideration is wholly of bona fide foreign authorship relies mainly on the case

of *Kelly Publishing Co.* v. *United States*, T. D. 43493, and that of *Japanese American News* v. *United States*, 2 Cust. Ct. 10, C. D. 76, wherein it was claimed that the authorship of the books there in question was determined by the nationality of the creator or compiler of the books, and not by the origin of the subject matter collected by the compiler for incorporation in the books.

In the *Kelly* case, *supra*, a book of 2 volumes entitled "Kelly's Directory of Merchants, Manufacturers, and Shippers of the World" contained certain advertisements and statistical information of individuals and concerns located throughout the world; also, in addition to indexes of firms and the industries in which they were engaged, the books contained statistical information of different countries as to population, amount of imports and exports, etc. It appeared of record that such data were procured from every part of the world, and that the book in its published form was the work of an Englishman located in the home office of the publishing company, who went through all the copy material and decided what should be put in. This court held the book to be susceptible of authorship under the *American Railway Express Co.* case, *supra*, as requiring mental effort and ability to prepare, and as it was also established that the author or compiler thereof was an Englishman, it was further held that the book was of bona fide foreign authorship under said paragraph 1310 of the Act of 1922.

The above case, however, has really no bearing or application to the one at bar. The main question in that case was whether the compilation of the statistical information contained in the directory was in fact of the nature of authorship, and not whether the said compilation was solely the work of a foreign author or authors. The same thing may be said of the *Japanese American News* case cited by plaintiff. When the question of authorship lies between the compiler of information and statistics, such as in the last two cited cases, and the authorship of a book of selected poems which represent the real subject matter of the book, as in the present instance, we think a different situation is presented.

Counsel for plaintiff in their brief, admit that when several individuals collaborate in *writing* a book they are co-authors, and that the subject matter of such book must be considered in connection with the nationality of each of the writers of its subject matter to determine the authorship of the book; that likewise, when someone merely publishes the collected works of a single author, such as Shakespeare, Milton, Shaw, etc., the authorship of such a book may not be said to be that of the publisher, but that of the writer of the text. It is argued further, however, that when an individual, after careful research, collects excerpts from the work of many different writers, and produces a *new book*, the authorship of that book is

properly determined by the nationality of the creator thereof without out consideration of the origin of the subject matter.

We cannot agree with plaintiff's proposition that the selection or compilation of various verses or poems by well-known authors, such as in the present instance, and the arrangement of same into book form for publication in itself changes the authorship of the combined poems to that of the compiler thereof. The entire subject matter of the book in question consists of these selected poems of foreign and American authors, and while the compilation of the selections and the arrangement thereof in their present form undoubtedly required mental effort and ability, we think it would be illogical to say that the authorship of the poems was thereby transferred to the compiler thereof. We can find no such authority for same, and we hardly think it necessary to give this point further consideration.

There can be no question that all the authors of the various poems and verses contained in said book must be considered as co-authors of the book, and as 28 pages thereof admittedly represent the participation of the American authors therein, as against the remaining 1113 pages which may be said to be of foreign authorship for all practical purposes, it only remains to determine whether the part contributed by the American authors is substantial enough in character or quantity to negative the proposition that the book is wholly or substantially wholly of foreign authorship.

In *G. P. Putnam's Sons* v. *United States*, T. D. 48886, this court had before it certain books entitled "Fine Prints of the Year 1934," comprising a collection of pictorial reproductions of etchings, engravings, etc., 12 pages of the preface of which, descriptive of said prints, being of foreign authorship, and 9 pages thereof of American authorship. The books also contained a "Directory of Etchings and Engravings," 6 pages of which were compiled by the foreign author and 7 pages by the American author. There the claim also was made for classification of the book as of bona fide foreign authorship under said paragraph 1410 of the Tariff Act of 1930, as against the collector's assessment of duty thereon as books of other than foreign authorship. This court therein held that said provision for books of bona fide foreign authorship, "standing alone without further qualification or modification, and without specifying to what extent the books must be of foreign authorship, can only mean that such books must be wholly or substantially wholly of foreign authorship."

In *J. E. Bernard & Co., Inc.* v. *United States*, 6 Cust. Ct. 84 (C. D. 433), this court had under consideration certain books entitled "The March of Man," as to which it was stipulated that an American citizen collaborated with two citizens of England in the preparation of the American section of the Historical Atlas. No particular part of the book, however, was pointed out as constituting such American

section. However, under the title "Time Chart List of Sections," consisting of 7 sections or charts, the court found that 5 of the 7 sections devoted about one column each of printed information to the history of Latin America, and that 3 of the sections or charts devoted about a column each to the subject of the United States of America. On the assumption that these two parts represented the work of the American citizen, the court considered that they constituted very substantial parts of the printed historical text contained in the book, and again held that said provision for books of bona fide foreign authorship contemplated only such books as were wholly (or substantially wholly) of such foreign authorship. The claim of the plaintiff was accordingly overruled.

In the later case of *J. E. Bernard & Co., Inc.* v. *United States*, C. D. 785, this court had before it books entitled "Pathology and Therapeutics of the Diseases of Domestic Animals," each book consisting of 3 volumes aggregating 2429 pages. These books were likewise assessed for duty under paragraph 1410 of the Tariff Act of 1930 as of other than bona fide foreign authorship, and were claimed to be dutiable under the same paragraph as being of bona fide foreign authorship. It appeared that Dr. Franz Hutyra, Dr. Joseph Marek, and Dr. Rudolph Manninger were the original foreign authors of the book, and that volume 1 thereof contained certain annotations by two citizens of the United States on 34 pages of that volume, which annotations were in the nature of editorial remarks, explanations, and corrections rather than in the nature of original authorship. It was held that the books were properly dutiable as of bona fide foreign authorship, and it was further held that, even were said annotations regarded in the nature of original authorship, in view of the small amount or percentage of the whole printed text represented thereby the books would still be dutiable under the same provision as books substantially wholly of foreign authorship. The annotations of the said two American citizens on the 34 pages of volume 1 consisted in most instances of not more than 3 to 6 lines on the page, so that it will be seen that in comparison with the 2429 pages of the entire work the part represented by the annotations of the American citizens was really very small and trivial in quantity.

As already stated, "The Oxford Book of English Verse" in the present instance comprises 1141 pages, of which approximately 28 pages consist of poems or verses by American authors, such as Thanatopsis, by William Cullen Bryant, etc., and the only question for our determination is whether the part of the book represented by the American authors forms a substantial part thereof, or whether it is so negligible in character and quantity that it may be disregarded.

As to what has, or what has not, been held to be trivial or negligible quantities or components, either as to character, quantity or value,

in the classification of imported merchandise, we think the following cases may also be referred to:

In *Godillot* v. *United States*, 1 Ct. Cust. Appls. 239, T. D. 31275, certain cherries in maraschino in bottles or tins containing 3.10 per centum of alcohol were held to bring it within the classification of paragraph 263 of the Tariff Act of 1897, as fruits preserved in spirits. We quote from that decision as follows:

> It is most difficult to undertake to draw a dividing line based upon the percentage of alcohol present. We think, however, that in the present case there was a sufficient quantity of alcohol in all these importations to serve a purpose in preserving the fruit so that after being opened the fruit could be used in the ordinary course without fermentation. It served a purpose, therefore, of preserving the fruit, and the fruit was preserved, in that sense at least, in spirits.

Abstract 25341 (20 Treas. Dec. 713) covered, among other things, figs in maraschino containing from 0.55 to 1.40 per centum of alcohol. This court (then the Board of General Appraisers) held the small quantity of alcohol apparently to be negligible as a preservative and not dutiable as fruits preserved in spirits. Likewise, in Abstract 28013 (22 Treas. Dec. 474) cherries in maraschino containing from 0.35 to 0.75 per centum of alcohol were held not dutiable under paragraph 274 of the Tariff Act of 1909, as fruits preserved in spirits.

In *United States* v. *Bryant & Beinecke*, 10 Ct. Cust. Appls. 79, T. D. 38355, certain cotton duck or canvas, about 28½ to 30½ inches wide, having a single blue warp thread equally visible on both surfaces and running lengthwise of the fabric about an inch from each edge, the blue thread serving only for a marginal guide line in making up the fabric and not affecting the cloth either as to price, strength, or embellishment, was held dutiable under paragraph 252 of the Tariff Act of 1913 as cotton cloth, not colored. In other words, the two colored threads in the fabric were held not to form a necessary and *substantial* part of the article.

In *Thornley & Pitt* v. *United States*, 5 Cust. Ct. 169 (C. D. 393), four colored threads in cotton cloth were held to be a substantial coloring of the fabric so as to bring it within the provision for cotton cloth, colored, under paragraph 904 (c) of the Tariff Act of 1930, rather than under paragraph 904 (a), as cotton cloth, not colored.

In *Cosmos Textile Corp.* v. *United States*, 21 C. C. P. A. 124, T. D. 46449, cotton cloth containing from 2 to 3 per centum of wool fibers was held dutiable as "cloth, in chief value of cotton, containing wool," under paragraph 906 of the Tariff Act of 1930, rather than as "cotton cloth" under paragraph 904. The legal maxim, *de minimis non curat lex*, was held not applicable in the case.

On the other hand, in *Schenkers (Inc.)* v. *United States*, T. D. 44916 (59 Treas. Dec. 1257), certain cotton suitings, which, according to the analysis by the Government, showed it to contain wool "in amounts

estimated to be less than 1 per centum," and according to analysis made by plaintiff's analyst, contained not more than one-tenth of 1 per centum of woolen fibers, were held to be properly dutiable under paragraphs 903 and 904 of the Tariff Act of 1930 as cotton cloth, under the legal maxim *de minimis non curat lex*—the law does not concern itself with trifles.

In our opinion, the portion of the book here in question of American authorship, consisting of 28 pages, or 2.45 per centum of the total of 1141 pages, must, under authority of the foregoing decisions, not only be regarded as substantial in quantity, but also as representing authorship of the highest quality. The imported books therefore, being in substantial part of other than foreign authorship, are not classifiable under said paragraph 1410 and said trade agreement with the United Kingdom, as books wholly or substantially wholly of bona fide foreign authorship, as claimed, and were properly assessed for duty under the provision of the same paragraph, as books of other than bona fide foreign authorship.

The claim of the plaintiff herein is therefore overruled. Judgment will be rendered accordingly.